# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

———

No. 08-6023

———

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Cheryl A. Reagan, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Cheryl A. Reagan, | * | Appeal from the United States |
| | * | Bankruptcy Court for the Western |
| Debtor - Appellant, | * | District of Arkansas |
| | * | |
| v. | * | |
| | * | |
| Frederick S. Wetzel, III, Trustee; | * | |
| 1919 M Street Associates, L.P.; | * | |
| G. Latt Bachelor, Personal | * | |
| Representative of the Estate of | * | |
| Ronald E. Reagan, | * | |
| | * | |
| Objectors - Appellees. | * | |

———

Submitted: February 24, 2009
Filed: March 30, 2009

———

Before KRESSEL, Chief Judge, FEDERMAN and VENTERS, Bankruptcy Judges.

———

KRESSEL, Chief Judge.

Cheryl A. Reagan appeals from orders of the bankruptcy court[1] which approved the sale of Federal News Service, Inc., denied her motion to dismiss the case or remove the trustee, and approved the conversion of her case from a case under chapter 11 to a case under chapter 7.

## BACKGROUND

Cheryl A. Reagan's husband, Ronald E. Reagan, died in 2000, leaving her $16.9 million out of his estate of nearly $20 million. More than $13.1 million of Reagan's inheritance was in the form of cash from the sale of Ronald's businesses. She was appointed executrix of Ronald's estate, with an obligation to fund a qualified terminable interest property trust. *See* 26 U.S.C. § 2056(b)(7)(B). As the beneficiary of the trust, Reagan would have received a sizeable income. Although it is unclear from the record exactly how Reagan used her inheritance in the months and years that followed, it is clear that the QTIP trust was not fully funded, and that instead, the funds rapidly dissipated primarily due to her failed investment strategies. One business she acquired was FNS, which produces transcripts of government briefings, speeches, and press conferences for news agencies. It is based in Washington, D.C., but also had international offices, including an office in Israel. She purchased FNS because of its Israel office, and because she believed it would further her goal of correcting what she saw as inaccuracies in Western media coverage of the Israeli-Palestinian conflict.

---

[1] The Honorable Ben T. Barry, United States Bankruptcy Judge for the Eastern and Western Districts of Arkansas.

Reagan's plans went awry. The Garland County probate court froze all of Ronald's estate's assets in April of 2004. Then 1919 M Street Associates, L.P. obtained a $1.5 million judgment against her. Meanwhile, Ronald's estate was suing FNS for over $1 million loaned to it during Reagan's tenure as executrix. Reagan filed a voluntary chapter 11 petition on November 17, 2004.[2]

In August of 2005, the United States Trustee filed a motion to convert Reagan's case from chapter 11 to chapter 7, or in the alternative, to dismiss it. The hearing on the motion was continued several times. In June of 2006, the probate court removed Reagan as executrix of Ronald's estate because of a conflict of interest and appointed G. Latta Bachelor, III in her place. The probate court ordered Bachelor to liquidate Ronald's estate's claims against Reagan, which he did in a settlement agreement for approximately $5.6 million.

Reagan unsuccessfully attempted to confirm four chapter 11 plans. On March 21, 2007, Bachelor brought a motion on behalf of Ronald's estate for the appointment of a chapter 11 trustee, which he followed with a motion on March 23, 2007 to convert or dismiss. On April 12, 2007, the court held a hearing on Bachelor's motions and the United States Trustee's August 2005 motion to convert or dismiss. The court agreed with Bachelor and the United States Trustee that Reagan had not been fulfilling her fiduciary duties and that appointment of a chapter 11 trustee was necessary,

---

[2] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (codified as amended in scattered sections of 11 U.S.C.), governs cases filed on or after October 17, 2005. Since this case was commenced before the 2005 bankruptcy amendments, the prior version of the statute applies and all references are to the pre-BAPCPA statute in effect in 2004.

although it still might not be enough to accomplish a successful reorganization. The court commented that if the trustee were unable to confirm a plan in six months, conversion might then be appropriate. Frederick S. Wetzel was appointed as the trustee.

On March 21, 2008, approximately one year after his appointment as the chapter 11 trustee, Wetzel filed a notice of the sale of the assets of FNS, the largest asset of Reagan's bankruptcy estate. The creditors and the United States Trustee supported the sale but Reagan objected, arguing that FNS was worth more than the proposed sale price. Reagan, who had been through three lawyers (by the time she brought this appeal, there had been four), became frustrated with the progress of the case and her lack of control over the estate. In response to the trustee's sale motion, on April 2, 2008, she filed a motion to dismiss her chapter 11 case or in the alternative to remove the trustee. The trustee then filed a motion to convert the case to chapter 7.

**Combined Hearing on the Motions to Convert or Dismiss, Remove the Trustee, and Approve the Sale of FNS**

The court held a combined hearing on April 11 and 12, 2008 on the motions to convert, dismiss, remove the trustee and approve the sale of FNS. The court announced its findings of fact on the record in open court and issued two orders on May 16, 2008 (Order Denying Debtor's Motions to Dismiss Case or Remove the Trustee and Concerning Trustee's Motion to Convert Case and Order Approving Sale of Federal News Service, Inc.). In the first order, the court found that cause existed for dismissal or conversion and that conversion was in the best interest of the creditors and the estate. The court concluded that there was no cause to remove the trustee,

4

whom the court found to have been acting competently and reasonably. It declined to remove the trustee, denied Reagan's motion to dismiss the case, and ordered the case converted to chapter 7 after the sale of FNS closed.

In the second order, the bankruptcy court approved the sale of FNS to a stalking horse bidder[3], Congressional Quarterly, conditioned on the following: 1) payment of Reagan's severance package in full; 2) a sixty-day waiting period beginning April 18, 2008 to allow for additional offers from other buyers; and 3) notification by the trustee of the proposed sale to all other identifiable entities in the same business as FNS in order to solicit additional offers. If the trustee's efforts resulted in a competing bid with terms no less favorable to the estate than those proposed by CQ (including a $100,000.00 premium in the agreement), the competing bid could be accepted *without notice to the court* but CQ would be awarded a $50,000.00 break-up fee. In addition, the court required the sale to be pursuant to a definitive agreement, the proceeds had to be free and clear of any liens or interests of Reagan's creditors, and the proceeds

---

[3] "In the bankruptcy context, a stalking horse bidder reaches an agreement with the debtor-in-possession [or trustee] to purchase assets prior to the court-supervised auction of those assets." *M & M Holdings, LLC v. Unsecured Creditors Comm. (In re SpecialtyChem Prods. Corp.)*, 372 B.R. 434, 436 (E.D. Wis. 2007). The parties anticipate that the "bid will be exposed to higher and better bids at auction." *Id*. The purpose of a stalking horse bid is merely to "set the floor" on the auction price. Bret Rappaport & Joni Green, *Calvinball Cannot Be Played on this Court: The Sanctity of Auction Procedures in Bankruptcy*, 11 J. Bankr. L. & Prac. 189, 194-95 (2002). Stalking horse bids may generate interest in the assets and create a sense of confidence in the value of the assets among prospective buyers who might assume that a willing buyer has conducted due diligence. In the event that the stalking horse bidder is outbid, courts often approve break-up fees "[t]o compensate the stalking horse for the 'cost' of showing its hand before the auction, conducting due diligence and otherwise facilitating the creation of a market." *Id*.

had to first be applied to the valid debts of FNS with any surplus retained by the trustee.

Reagan argued that the trustee should have engaged in formal and more extensive marketing prior to the sale, but the bankruptcy court disagreed. Extensive marketing was not necessary, the court found, because there were few businesses like FNS, the number of potential buyers of such a specialized business is limited, and any potential buyers who were interested in purchasing and able to purchase FNS had already come forward. The court found that the sale was based upon good business judgment and that it was proposed in good faith.

The bankruptcy court addressed Reagan's concern that the proposed sale price of FNS was approximately three-quarters of the $4 million she had paid for it several years earlier. The court considered CPA Stephen Leek's testimony that, assuming the annual future income was $400,000.00, the net value would be between $2 million and $3 million. The court also considered FNS's balance sheets and other documents, which reflected a $2.6 million net worth. The court noted that FNS's future operations were uncertain; that if FNS were liquidated, it would result in a lower amount being paid to creditors; that everyone other than Reagan, including the United States Trustee, approved of the sale; and that Ronald's estate had a lien against the assets of FNS and could possibly pursue attachment of the assets, which would leave the business with no assets for its operations. As a result, the court found that the price was fair and reasonable under the circumstances. The court noted that its order would not prohibit Reagan from contacting potential bidders to convince them that the business was worth more.

# Appeal

Reagan appeals both orders.[4] Reagan filed a motion for stay of the May 16, 2008 orders pending appeal but withdrew her motion. Reagan missed the deadline for appeal, but the bankruptcy court granted her an extension on June 13, 2008 under Federal Rule of Bankruptcy Procedure 8002(a), after finding that she had alleged a proper showing of excusable neglect pursuant to *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship.*, 507 U.S. 380 (1993).[5] The bankruptcy court denied Reagan's motion to stay the May 16 order pending this appeal.

At our request, the trustee reported that he received a bid for FNS from The Investment Group. Pursuant to the court's terms, the trustee accepted the bid and proceeded with the sale. In his report, he stated that the sale had closed.

---

[4] While not raised by either party, we are concerned about the finality of the order as it relates to conversion. It seems to us, however, that the conversion order can be considered final because the entry of the order of conversion following the sale is only a mechanical or ministerial task, it does not require the court to exercise further discretion, and the court has already resolved the merits of the controversy. *Lewis v. United States, Farmers Home Admin.*, 992 F.2d 767, 771 (8th Cir.1993).

[5] Although the bankruptcy court lacked the authority pursuant to Rule 8002(c)(1)(B) to extend the time to appeal the sale order, no one has challenged the extension so it is effective. *See Dill v. Gen. Am. Life Ins. Co.*, 525 F.3d 612 (8th Cir. 2008).

## Standard of Review

The bankruptcy court has broad discretion in deciding whether to dismiss or convert a chapter 11 bankruptcy case, and its decision is reviewed for an abuse of discretion. *Hedquist v. Fokkena (In re Hedquist),* 450 F.3d 801, 804 (8th Cir. 2006); *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),* 235 F.3d 375, 379 (8th Cir. 2000); *Lumber Exch. Bldg. Ltd. P'ship v. The Mut. Life Ins. Co. of New York (In re Lumber Exch. Bldg. Ltd. P'ship),* 968 F.2d 647, 648 (8th Cir. 1992). The decision to deny a motion to remove a trustee is reviewed for an abuse of discretion. *Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan v. M & S Grading, Inc. (In re M & S Grading, Inc.)*, 541 F.3d 859, 867 (8th Cir. 2008). "The bankruptcy court abuses its discretion when it fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous." *Official Comm. of Unsecured Creditors v. Farmland Indus., Inc. (In re Farmland Indus., Inc.)*, 397 F.3d 647, 651 (8th Cir. 2005). The appellant does not dispute any of the bankruptcy court's findings of fact.

## DISCUSSION

**1.    Because the sale has already occurred, the appeal of the sale order is moot.**

Although Reagan attempted to stay the sale of FNS pending appeal, her motion was denied. The relief she seeks is to have the sale overturned and to have FNS returned to her bankruptcy estate, but after Reagan filed her appeal, the sale of FNS proceeded and closed. "If, while an appeal is pending, an event occurs that eliminates

the court's ability to provide any effectual relief whatever, the appeal must be dismissed as moot." *Nieters v. Sevcik (In re Rodriquez),* 258 F.3d 757, 759 (8th Cir. 2001) (per curiam) (citing *In re Security Life Ins. Co.,* 228 F.3d 865, 870 (8th Cir. 2000)). 11 U.S.C. § 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

Consequently, courts of review are unable to supply a remedy after a sale under 11 U.S.C. § 363 (b) or (c) has occurred. *Wintz v. American Freightways, Inc. (In re Wintz Cos.),* 219 F.3d 807, 811 (8th Cir. 2000) (where appellants failed to obtain a stay pending appeal and property had been transferred to a bona fide third party purchaser, 11 U.S.C. § 363(m) bars the attempt to overturn the § 363 sale on appeal); *United States v. Fitzgerald*, 109 F.3d 1339, 1342 (8th Cir. 1997) ("a debtor who fails to obtain a stay of the sale has no remedy on appeal and the appeal is moot"); *Van Iperen v. Prod. Credit Assoc. of Worthington- Slayton Branch (In re Van Iperen),* 819 F.2d 189, 191 (8th Cir. 1987) (per curiam) ("Once collateral is taken and converted into cash, no court is able to formulate adequate relief to the debtor."). Because the sale of FNS to a third party purchaser has already occurred, we must dismiss her appeal from the sale order as moot.

9

**2.      The court did not abuse its discretion in declining to dismiss the case and instead converting it.**

The bankruptcy court denied Reagan's motion to dismiss her case and approved the conversion of Reagan's case from chapter 11 to chapter 7 pursuant to 11 U.S.C. § 1112(b), which provided in relevant part:

> on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause . . . .

The bankruptcy court found that there was cause for conversion or dismissal.

No one except Reagan disputed that there was little chance of a successful reorganization, and the court found Reagan's hope that the business would turn around to be "a lot of pie in the sky." "However honest in its efforts the debtor may be, and however sincere its motives, the ... Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *Tenn. Publ'g. Co. v. Am. Nat'l Bank,* 299 U.S. 18, 22 (1936).

The Bankruptcy Code contains a lengthy but non-exclusive list of examples of cause for dismissal or conversion of a chapter 11 case, which the bankruptcy court may take into consideration in its decision of whether to dismiss or convert. 11 U.S.C.

10

§ 1112(b). Pre-BAPCPA[6] examples included:  "(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation" and "(2) inability to effectuate a plan." 11 U.S.C. § 1112(b)(1)-(2). Reagan does not dispute that cause existed for "dismissal or conversion," and in fact she conceded in her dismissal motion that the bankruptcy estate was experiencing "a substantial and continuing loss and diminution without any reasonable likelihood of rehabilitation." Although "one ground for cause is sufficient standing alone," the second example of cause was also met. *Loop Corp. v. United States Trustee*, 290 B.R. 108, 112 (D. Minn. 2003). Reagan had unsuccessfully attempted to confirm four plans in four years, and since the appointment of the chapter 11 trustee, over six months had passed without anyone, including Reagan, attempting to confirm a plan. The court found that it was highly unlikely a plan would be confirmed in the future because there was not enough money available to fund an adequate plan.

In her motion to dismiss, Reagan claimed that creditors would be treated more favorably if the case were dismissed rather than remaining in chapter 11 or converting to chapter 7, essentially because she believed she would be able to pay her creditors in full outside of bankruptcy over three to four years. However, she planned to fund those payments with "earnings of FNS," which are no longer available to the estate now that FNS has been sold. Moreover, the court found that without the protection of

---

[6] 11 U.S.C. § 1112(b) was amended in 2005 to include additional examples of cause such as:  "(B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter" and others.

the automatic stay, Reagan would be vulnerable to immediate action by two aggressive creditors. The court doubted that her strategy of "talking" with those creditors would be fruitful. Reagan also argued that dismissal would allow her to "protect the interests of FNS" by preventing its sale, but the sale has now occurred. Finally, she was frustrated with the trustee for not pursuing a frivolous appeal of the January 5, 2007 settlement entered in probate court and believed she might successfully appeal the settlement if her case were dismissed.

Having concluded that cause existed, the court found that conversion, not dismissal, was in the best interest of the creditors and the estate. A crucial advantage of converting the Reagan case rather than dismissing it is that following a conversion, the case would be administered by a chapter 7 trustee while a dismissal would return all control to Reagan. The record is replete with detailed findings about Reagan's mismanagement and foundering reorganization attempts, all of which support the court's conclusion that it is in the best interest of the creditors and the estate for the case to be converted and overseen by a trustee rather than returning control to Reagan.

In support of its finding that conversion was in the best interest of the creditors and the estate, the court noted that all parties except Reagan supported conversion. However, Reagan admitted that in her business endeavors, she had "a penchant for hooking up with outlaws." The court found that Reagan had taken an estate of nearly $20 million and, over the course of just a few years, "invested in no less than three or four corporations that are either defunct, bankrupt, or have no value or minimal value." Reagan's mismanagement and dysfunctional approach to her affairs not only

12

contributed to the need for reorganization in the first place but also undermined the estate's reorganization attempts.

The court noted that Reagan had been removed from management of Ronald's probate estate as a result of a conflict of interest, and that the court had removed her as debtor-in-possession because she had failed to file operating reports or income tax returns, paid professionals without permission, and had taken extraordinary risks with money. In light of that history, the court found that her management would be no less disastrous in the future, and could be even worse because she would no longer owe a fiduciary duty to the estate and because without the protection of the automatic stay, she could find one major creditor, 1919 M Street, "jumping on her with both feet," while the other major creditor, Ronald's estate, would similarly be free to go after any remaining assets.

The court expressed concern that if it dismissed the case, Reagan would be free to file another chapter 11 petition. Finally, the court noted that Reagan had filed her chapter 11 petition voluntarily, her estate had benefitted from the automatic stay and staved off creditors for four years, and that she should not be able to walk away from the bankruptcy now that she felt it did not suit her purposes. Reagan's personal preference for dismissal must yield to the best interest of the creditors and the estate. "[A] debtor seeking relief in a bankruptcy court must travel a two-way street." *In re Kang*, 18 B.R. 680 (Bankr. Ill. 1982). Because the best interest of the creditors test was applied correctly and is fully supported by the record, we affirm.

13

### 3. The court did not abuse its discretion in denying the motion to remove the trustee.

Reagan argued that the trustee had exercised poor business judgment by: 1) causing the value of FNS to decrease dramatically; 2) firing most of the senior management and employees of FNS; 3) hiring management and employees for FNS who were "unqualified"; 4) filling FNS's CEO position with a "former disgruntled employee" who was not loyal to FNS and who had allegedly disabled an FBI-installed surveillance system intended to track criminal acts of information theft; 5) not remedying the "old and worthless" transcripts being produced by FNS's Mideast office; 6) closing FNS's Israel and Moscow offices; 7) selling assets of the estate below market value; 8) selling an asset to an insider; and 9) proposing to sell FNS to CQ, which she believed would violate limitations imposed on FNS and CQ by the Federal Trade Commission.

Although Reagan did not cite a statutory basis for her motion to remove the chapter 11 trustee in her case, it presumably arose under 11 U.S.C. § 324(a), which provides: "The court, after notice and a hearing, may remove a trustee, other than the United States trustee, or an examiner, for cause." "Cause" is not a defined term, but removal is an extreme remedy and some courts have construed it to require the moving party to prove actual injury or fraud. *See, e.g., Morgan v. Goldman (In re Morgan)*, 375 B.R. 838, 848 (B.A.P. 8th Cir. 2007); *In re Olympia Holding Corp.*, 305 B.R. 586, 591 (Bankr. M.D. Fla. 2004); *In re Sheehan,* 185 B.R. 819, 822 (Bankr. D. Ariz. 1995). "A conclusory contention unsupported by specific facts does not constitute sufficient grounds for the removal of a trustee." *Alexander v. Jensen-Carter*

14

*(In re Alexander),* 289 B.R. 711, 714 (B.A.P. 8th Cir. 2003) (citing *In re Schultz Mfg. Fabricating Co.,* 956 F.2d 686, 692 (7th Cir. 1992)). Removal of a trustee is not appropriate where a movant only alleges "mistakes in judgment where that judgment was discretionary and reasonable under the circumstances." *In re Lundborg,* 110 B.R. 106, 108 (Bankr. D. Conn. 1990) (citing *In re Haugen Constr. Serv., Inc.,* 104 B.R. 233, 240 (Bankr. D. N.D. 1989)).

The bankruptcy court found no evidence of any misconduct by the chapter 11 trustee, nor any evidence of mistakes in judgment. Reagan did no more than raise conclusory contentions unsupported by specific facts and disagree with the trustee's business management. The court rejected Reagan's arguments, and found that the trustee had handled the case and the sales exactly as he should have, that he handled them in a manner similar to most trustees, and that the trustee was competent, knowledgeable, and level-headed.

Although Reagan appears to have abandoned the argument on appeal, she had argued that part of the trustee's alleged mismanagement was his failure to pursue a claim against CQ, the stalking horse bidder. The court found that "proof is sorely lacking that that's a viable asset for which this estate ought to be placed into suspension." On appeal, Reagan argues that the trustee's failure to file a chapter 11 plan constituted cause for removal. The bankruptcy court found, however, that the trustee was not at fault for not having proposed or confirmed a plan at that point, and noted that his liquidation of some assets was not necessarily inapposite to chapter 11 reorganization. The bankruptcy court's findings are supported by the record.

Reagan is upset that she has lost control of the bankruptcy estate and the fate of her case, but her opportunity to manage the bankruptcy case has passed because of her own mismanagement, not because of an underhanded conspiracy among her creditors and the trustee. Because the bankruptcy court did not abuse its discretion in denying the motion to remove the trustee, we affirm.

### 4. Other issues raised in the appellant's brief are unrelated to the appealed orders and we decline to address their merits.

Reagan asks us to intervene in several other matters not before us on appeal: to make the sale of her homestead "null and void"; to grant to her the right to purchase a house in Poriyya Ilit, Israel "out of income due her from the Ronald E. Reagan Estate"; to "return" FNS to her; and to "rule on the Marshal v. Marshal Supreme Court ruling regarding the authority of the bankruptcy court to sell Probate assets." In addition, she raises other issues, which include: a settlement of $500,000.00 "given to 1919 M. Street" because "there were 'causes of action' against them that need to be addressed"; compensation and fees for attorneys of Ronald's probate estate; several attorneys' "illegal" representation of her step-sons; those attorneys' breach of fiduciary duty; failure of the trustee to reimburse Reagan from either Ronald's probate estate or FNS; her step-sons' "freezing the funds" of Ronald's probate estate; and finally, that the trustee and "opposing counsel have worked 'in concert' to keep any funds legally due" her so that she would not have money for adequate legal counsel.

These additional issues raised in the appellant's brief appear to refer to orders of the bankruptcy court which were not timely appealed, and even to orders of the probate court in Garland County. In either case, we lack the jurisdiction to review

16

them. Because only the May 16, 2008 orders are before this court on appeal and her other concerns are outside the scope of those orders, we decline to address their merits.

## CONCLUSION

The appeal of the order approving the sale of FNS is dismissed. The appeal of the order denying Reagan's motion to remove the trustee or dismiss her case and granting the trustee's motion to convert this case to chapter 7 is affirmed.

———————————